*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-AA-335

MARIA RAMOS, PETITIONER,

V.

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

P&R ENTERPRISES, INC. and
TRAVELERS INSURANCE COMPANY, INTERVENORS.

On Petition for Review of an Order of the
District of Columbia Department of Employment Services
Compensation Review Board
(CRB-4-19)

(Argued March 13, 2020                         Decided May 28, 2020)

*Carlos A. Espinosa*, with whom *Ivan M. Waldman*, was on brief, for petitioner.

*Caroline S. Van Zile*, Deputy Solicitor General, with whom *Karl A. Racine*, Attorney General, and *Loren L. Alikhan*, Solicitor General, filed a statement in lieu of a brief, for respondent.

*Amy L. Epstein* for intervenors.

Before GLICKMAN, EASTERLY, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Maria Ramos suffered a stroke in the course of her custodial work. She brought a claim for workers' compensation benefits under the District of Columbia Workers' Compensation Act. *See* D.C. Code §§ 32-1501, *et seq.* (2019 Repl.). The Administrative Law Judge (ALJ) denied her claim, and the Compensation Review Board (CRB) affirmed that denial, each concluding that her stroke was not causally related to her work. Ms. Ramos now appeals the CRB's judgment.

The Workers' Compensation Act affords claimants a presumption that an injury is causally connected to their work, and therefore compensable, whenever they present "some evidence" of "a work-related event, activity, or requirement which has the *potential* of resulting in or contributing to the death or disability." *Ferreira v. District of Columbia. Dep't of Emp't Servs.*, 531 A.2d 651, 655 (D.C. 1987); D.C. Code § 32-1521(1). Once triggered, the employer may sever this presumed causal connection only by presenting "substantial evidence" "specific and comprehensive enough to sever the potential connection between a particular injury and a job-related event." *Ferreira*, 531 A.2d at 655 (quoting *Swinton v. J. Frank Kelly, Inc.*, 554 F.2d 1075, 1083 (D.C. Cir. 1976)). The CRB reasoned that while Ms. Ramos had triggered the presumption of causality—a finding that is not

challenged here—her employer presented substantial evidence sufficient to rebut that presumption. We disagree. We reverse and remand for further proceedings.

## I.

Ms. Ramos worked as a janitor for P&R Enterprises, Inc. Her job involved emptying trash cans and cleaning offices on two floors of a large office building that spanned a city block. According to her credited testimony, the trash cans were often filled with books and paper so that they could be "very heavy,"[1] and she had to move quickly in order to complete her work within her five-hour shift. On April 19, 2016, Ms. Ramos was working hurriedly when, about halfway through her five-hour shift, a "heat wave" came over her, her extremities went numb, and she collapsed. She got up only to collapse again. Ms. Ramos's supervisor called for an ambulance which transported her to the hospital where she was diagnosed as having suffered from a hemorrhagic stroke.

---

[1] Ms. Ramos's supervisor estimated that even when filled to the brim with paper or books, each trash can Ms. Ramos had to lift would weigh only "10 pounds approximately." The larger receptacle that she emptied the smaller cans into was on wheels so that she would only have to push rather than lift it.

Ms. Ramos's stroke did not come without warning. She was diabetic and had a history of hypertension, as well as a pattern of skipping the medications prescribed to control her high blood pressure. Eight months before her stroke, she was admitted to the hospital following an automobile accident and her blood pressure was measured at an alarming 242 (systolic) / 152 (diastolic).[2] In the months following her stroke, Ms. Ramos's treating physician, Dr. Claudia Husni, opined that her stroke was "a consequence of" her hypertension, further noting that the stroke had left her permanently unable to use her left hand and arm.

Ms. Ramos filed a claim for workers' compensation benefits and ultimately requested a formal hearing before an ALJ. Ahead of the hearing, the parties indicated that the only contested issue between them was whether Ms. Ramos's stroke was causally related to her employment. The medical evidence as to that question came primarily from Dr. Allen A. Nimetz, who at the request of the employer, performed an independent medical evaluation of Ms. Ramos and

---

[2] As a reference point, Dr. Nimetz testified that high blood pressure was once defined as anything above 140 systolic and 90 diastolic, and that those numbers had dropped even lower in the year prior to his testimony. Ms. Ramos's 242 / 152 reading was well past the point that qualifies a person as being in the midst of a hypertensive crisis. *See High Blood Pressure*, AM. HEART ASS'N, https://www.heart.org/en/health-topics/high-blood-pressure (categorizing a person with blood pressure higher than 180 (systolic), *or* higher than 120 (diastolic), as experiencing a hypertensive crisis).

examined her medical records. Dr. Nimetz testified and authored a report that was admitted into the record. In his report, he opined that "[t]he major contributory factors [of Ms. Ramos's stroke] were uncontrolled hypertension and poorly controlled diabetes mellitus," and he concluded, "I would not attribute the cerebrovascular event [to] her employment." He repeated that conclusion in his testimony, noting that Ms. Ramos's diabetes and high blood pressure were conditions that "she brought into work when she started," leading him to conclude that she did not suffer "a work related injury or work related disease."

On cross-examination, Dr. Nimetz agreed that physical exertion will increase a person's blood pressure, including a person who already has high blood pressure, and agreed that strokes could result from high blood pressure. The ALJ then intervened and asked Dr. Nimetz, who had heard Ms. Ramos's testimony, whether he had "an opinion as to whether or not [Ms. Ramos's] job responsibilities would in any way cause her to have the stroke." He replied, "No. I have not witnessed what the responsibilities involve, and not looking at how much heavy duty it is, what the environment is. So I really can't make a[n] opinion on that."

In her closing arguments before the ALJ, Ms. Ramos maintained that her stroke was brought on by aggravation of her hypertension. She argued that injuries

are compensable even when the work merely contributes to the injury by aggravating a pre-existing condition, and that the evidence—including Dr. Nimetz's own testimony—was sufficient to trigger the presumption of compensability. In response, the employer pointed out that neither Dr. Nimetz nor Ms. Ramos's treating physicians ever stated that Ms. Ramos's employment responsibilities caused her stroke. The employer argued that Ms. Ramos was not even entitled to a presumption of causation because there was no medical evidence showing a causal relationship between her work responsibilities and her stroke.

The ALJ found that Ms. Ramos had produced enough evidence to trigger the statutory presumption of compensability but that Dr. Nimetz's report and testimony constituted "substantial evidence" rebutting the presumption. Having disposed of the presumption, the ALJ concluded that Ms. Ramos had not proven causation by a preponderance of the evidence. The compensation order dismissed Ms. Ramos's claim without mentioning her aggravation theory specifically, although it did note Dr. Nimetz's opinion that hypertension and diabetes were the "major contributory factors" of the stroke.

Ms. Ramos sought review by the CRB, contending that the ALJ had improperly found that the presumption had been rebutted. She reiterated her

argument that Dr. Nimetz's testimony about elevated blood pressure supported her theory of causation. In its response, the employer abandoned its argument that Ms. Ramos did not present sufficient evidence to trigger the presumption that her stroke was causally related to her employment. It instead relied upon its argument that it had adequately rebutted that presumption with "substantial evidence," as the ALJ had found. The CRB agreed, concluding that "Dr. Nimetz . . . rendered an unambiguous opinion that Claimant's stroke was not causally related to her employment."[3] The CRB discounted Dr. Nimetz's cross-examination testimony that he had no opinion as to whether Ms. Ramos's "job responsibilities would in any way cause her to have the stroke" as mere "answers to [] hypothetic questions, which we do not equate to be substantial evidence." The CRB affirmed the ALJ's conclusion that the presumed causal connection between Ms. Ramos's work and her stroke had been rebutted by "substantial evidence."

---

[3] The CRB described this as an "undisputed" point, a misplaced descriptor as this was the central point of the dispute before it. *See* Ms. Ramos's Mem. in Supp. of Appl. for Review at 10 (Feb. 13, 2019) ("Dr. Nimetz's testimony . . . provided a clear causal connection between Ms. Ramos's work related injury and her employment.").

**II.**

The only issue presented on appeal is whether the employer, P&R Enterprises, presented substantial evidence sufficient to rebut the presumption that Ms. Ramos's stroke was causally related to her work.[4]  While we defer to the factual findings below, what constitutes substantial evidence sufficient to rebut the presumption that one's work is causally related to their injury is a legal question that we review de novo. *See Washington Post v. District of Columbia Dep't of Emp't Servs.*, 852 A.2d 909, 914 (D.C. 2004) (quoting *Safeway Stores, Inc. v. District of Columbia Dep't of Emp't Servs.*, 806 A.2d 1214, 1219 (D.C. 2002)).  We review the CRB's final order, mindful that "we cannot ignore the compensation order which is the subject of the Board's review." *Georgetown Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 916 A.2d 149, 151 (D.C. 2007).

---

[4]  The employer does not dispute that Ms. Ramos presented evidence sufficient to trigger the legal presumption of causation.  For her part, Ms. Ramos does not dispute that she cannot prevail if that legal presumption was in fact rebutted, as that would have left her with the burden of proving causation by a preponderance of the evidence, *see McCamey v. District of Columbia Dep't of Emp't Servs.*, 947 A.2d 1191, 1214 (D.C. 2008) (en banc), and she does not purport to have carried that burden.  Ms. Ramos's sole point of contention is that the employer's evidence "does not raise [sic] to the level of substantial evidence required under the Act."

In analyzing the issue presented, it helps to first identify the precise target that substantial evidence was needed to rebut. The only theory of causation offered by Ms. Ramos, and the only one supported by some evidence, was that her work as a custodian involved physical exertion, which in turn may have raised her already high blood pressure, which in turn had the potential to trigger her stroke. As her counsel argued in closing, the evidence supported the possibility (at least enough to trigger the presumption of causality) that her high blood pressure "coupled with her activities at work" caused her stroke. Ms. Ramos reiterates on appeal that it was this theory that triggered the presumption in her favor—that her "stroke was caused as a result if [sic] her hypertension coupled with the normal blood pressure increase due to her physical exertion while doing her job"—and the employer does not contest that understanding or offer any alternative to it.[5]

Put another way, Ms. Ramos's theory was that her work aggravated her pre-existing hypertension. It is undisputed and well-established that this is a valid theory

---

[5] The ALJ found that Ms. Ramos triggered the presumption of causality because she "was emptying the trash at the time she fell and as a result was diagnosed with a hemorrhagic stroke," and the CRB did not revisit the question because it was uncontested before it. The ALJ's finding, while somewhat opaque, is best understood as a nod to Ms. Ramos's causal theory that the strain of her work exacerbated her high blood pressure thereby triggering a stroke and, in any event, that understanding is undisputed here.

of compensability under the Workers' Compensation Act. *See King v. District of Columbia Dep't of Emp't Servs.*, 742 A.2d 460, 468 (D.C. 1999) (citing *Ferreira*, 531 A.2d at 660). Under our "aggravation rule," it does not matter that work-related activities may have contributed to the injury only in part, that the injury would not have happened but for a pre-existing condition, or that the injury "might just as well have been caused by a similar strain at home or at recreation." *Id.* (quoting *Wheatley v. Adler*, 407 F.2d 307, 312 (D.C. Cir. 1968) (en banc)). Whether Ms. Ramos was teetering on the edge of a stroke independent of her work is thus beside the point; if her work inched her over that edge, however slightly, her injury is compensable.

Having nailed down the theory to be rebutted, we turn to whether the employer presented substantial evidence to accomplish that feat. We as a court have not endeavored to pinpoint a "precise quantum of proof needed to meet the substantial evidence threshold." *Washington Hosp. Ctr. v. District of Columbia Dep't of Emp't Servs.*, 744 A.2d 992, 1000 (D.C. 2000). Instead we have said that "substantial evidence" means evidence that is "specific and comprehensive enough to sever the potential connection between a particular injury and a job-related event." *Ferreira*, 531 A.2d at 655 (quoting *Swinton*, 554 F.2d at 1083).

Critical to this case is that an employer's substantial evidence must address the employee's specific theory of causation. Our recent opinion in *Battle* illustrates the point. *Battle v. District of Columbia Dep't of Emp't Servs.,* 176 A.3d 129 (D.C. 2018). In *Battle*, the employee triggered the presumption of causality by presenting some evidence that the cumulative impact of driving a bus for many years had caused or aggravated his back condition. *Id.* at 131–32. The employer's expert opined that the back condition was not job-related because it was not caused by any single incident. *Id.* at 135. But, we explained, "this was not the theory of causation that [the employee] advanced." *Id.* The employer had failed to address the employee's "cumulative impact" theory altogether. *Id.* "If the employer fails to address and rebut [the employee's] theory with substantial evidence, the presumption of compensability stands." *Id.* at 136. The employer in *Battle* had failed to rebut the presumption with evidence that was "specific and comprehensive enough" to sever the potential connection. *Id.* at 135.

So too here. Dr. Nimetz's report and testimony were generally non-responsive to Ms. Ramos's aggravation theory, and when he was ultimately pressed on it, he was agnostic. In his report, Dr. Nimetz opined that "[t]he major contributory factors" to Ms. Ramos's stroke "were uncontrolled hypertension and poorly controlled diabetes," and that he "would not attribute" Ms. Ramos's stroke to "her

employment." Those opinions do not address much less undermine Ms. Ramos's aggravation theory. The relevant question is not whether her work was the most dominant or even a major contributory factor to her stroke; it is whether it was *a* contributing factor, a question Dr. Nimetz's report does not opine on.[6] While Dr. Nimetz opined that he would not attribute the stroke to her work, that statement in context suggests that he would attribute Ms. Ramos's stroke only to the major contributing factors, to wit, the two major contributory factors he had just identified (diabetes and high blood pressure). That is in fact the only plausible explanation given that Dr. Nimetz admitted in his testimony that he did not know anything about Ms. Ramos's work activities when authoring his report.[7] His opinion was based

_____

[6] For the same reason, the underlying medical records and statements by other doctors do not constitute substantial evidence either. For example, Dr. Husni's statement that the stroke was "a consequence of" Ms. Ramos's hypertension is undoubtedly true, but consistent with aggravation, as explained above.

[7] During his testimony Dr. Nimetz indicated that Ms. Ramos's work "never came up when [he] saw her," and as to the strain of her work, he could "only judge from what she said today." As discussed further below, once he learned of Ms. Ramos's work responsibilities Dr. Nimetz became agnostic in his testimony about whether they contributed to her stroke. As discussed *supra* note 1, there was at least some tension between Ms. Ramos's description of her lifting "very heavy" waste bins and her supervisor's testimony that the bins would weigh about ten pounds when full, but neither Dr. Nimetz nor any other evidence suggested that discrepancy was of any import. In finding the presumption of causation rebutted the ALJ and CRB referred to Dr. Nimetz's report, his testimony, and Ms. Ramos's medical records—none of which addressed whether the job's manual labor was insufficiently strenuous to contribute to her stroke. There is nothing in the supervisor's opinion about the weight of the trash cans that, even if credited over Ms. Ramos's testimony,

largely on her medical records' failure to attribute the stroke to her work responsibilities, and we do not think those records' silence on the point can constitute substantial evidence any more than Dr. Nimetz's agnosticism could.[8]

Dr. Nimetz's testimony drives home the point that the opinions in his report were non-responsive to Ms. Ramos's aggravation theory. The one time he was asked to home in on the aggravation theory and express an opinion about how likely it was that Ms. Ramos's work triggered her stroke, Dr. Nimetz was utterly agnostic. When the ALJ asked Dr. Nimetz whether he had any opinion "as to whether or not [Ms. Ramos's] job responsibilities would in any way cause her to have the stroke," he responded with a resounding "No," that he had formed no "opinion on that." Read in light of that important concession, Dr. Nimetz's other statements attributing Ms.

---

could meaningfully contribute to a finding of substantial evidence rebutting Ms. Ramos's theory. It is undisputed that Ms. Ramos's work consisted of some manual labor, and the potential that it contributed to her stroke was not rebutted, regardless of the precise strain her work involved.

[8] Treating physicians may quite reasonably identify the predominant causes for medical events without surveying the universe of more minor contributing causes, or opine about physiological causes for injuries without cataloging broader environmental causes. Without some evidence that Ms. Ramos's treating physicians considered whether the nature of her work was a potential cause of her stroke, we do not construe their silence on that question as answering it in the negative. Just as Dr. Nimetz lacked (and expressly disavowed) any relevant knowledge about whether Ms. Ramos's work involved the sort of activity that would contribute to a stroke, there is every reason on this record to think her treating physicians did likewise.

Ramos's stroke to her pre-existing conditions are unilluminating and beside the point. The CRB was thus wrong to conclude "that Dr. Nimetz . . . rendered an unambiguous opinion that Claimant's stroke was not causally related to her employment." He rendered no opinion at all about that. He offered only non-sequiturs and, once focused on this critical question, agnosticism.

*Wheatley v. Adler*, 407 F.2d 307 (D.C. Cir. 1968) (en banc), is instructive. There, Mr. Wheatley had a pre-existing condition—"arteriosclerotic heart disease"—and suffered a fatal heart attack on the job. *Id.* at 309. Just before his heart attack, Mr. Wheatley had urinated outside in the cold, and his widow presented evidence that "the strain of urinating on a cold day could have" triggered his heart attack. *Id.* at 310. The employer's medical expert testified and, "assuming in hypothetical form [Mr. Wheatley's account of his day] (including the urinating in the cold)," opined that his death "was not the result of any activity involved" in Mr. Wheatley's employment. *Id.* The expert reiterated the conclusion, "that the attack was in no way related to his employment." *Id.* But when asked on cross-examination to focus on the particular aggravation theory presented by Mr. Wheatley, like here, the expert offered no opinion at all: "Asked whether [urinating in the cold] was more likely than not the cause, he said he could not really give a yes

or no answer." *Id.* at 311.[9] That record, the court concluded, did not "contain substantial evidence to dispel the statutory presumption" of causation and the court reversed the finding that Mr. Wheatley's heart attack "did not arise out of and in the course of his employment" *Id.* at 309, 314. *Wheatley* compels the same result here.

It bears stressing that substantial evidence need not be conclusive or even particularly compelling; but it does need to be targeted. An employer need not show, in order to rebut the presumption of causation, that causation was "impossible." *Safeway Stores*, 806 A.2d at 1220 (quoting *Washington Hosp. Ctr.*, 744 A.2d at 1000). It need only present evidence that "a reasonable mind might accept as adequate to support" the conclusion that there was no causal link between the employment and the injury. *Washington Post*, 852 A.2d at 914. For example, if Dr. Nimetz had opined that Ms. Ramos's exertion at work was unlikely to have triggered her stroke, that bare expression of unlikelihood might have cleared the substantial evidence bar. *See, e.g.*, *Wheatley*, 407 F.2d at 313 (to rebut the presumption of causation on an aggravation theory, one "at least" would have "to articulate that this

---

[9] The court in *Wheatley* acknowledged that "[c]omplaints have been voiced against the aggravation rule as applied to cardiac cases" but noted that precedent nonetheless dictated its application and that any desired change in the rule would be "appropriately addressed to Congress." 407 F.2d at 312. There is no dispute here that the aggravation theory presented by Ms. Ramos was a valid one.

possibility was improbable"). Yet Dr. Nimetz disavowed any such opinion and no other evidence directly addressed the aggravation theory. The presumption was therefore unrebutted and Ms. Ramos's claims are compensable.

## III.

We reverse the decision of the CRB and remand for further proceedings consistent with this opinion. Given our conclusion that there was insufficient evidence to rebut the presumption of compensability, the issue is not subject to reconsideration on remand. *See Battle,* 176 A.3d at 136 (citing *Parodi v. District of Columbia Dep't of Emp't Servs.*, 560 A.2d 524, 526 & n.5 (D.C. 1989)).

*So ordered.*